**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

ANGEL C. HARRISON,

       Plaintiff,

v.                                      Case No.: 3:10-cv-00775

MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,

       Defendant.

**MEMORANDUM OPINION**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 15 and 16). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 4 and 5).

The Court has fully considered the evidence and the arguments of counsel. For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I.**    **Procedural History**

Plaintiff, Angel C. Harrison  (hereinafter "Claimant"), filed applications for DIB and SSI on May 9, 2006, alleging that she had been disabled since April 9, 2006 due to

back pain, bipolar disorder, learning disabilities, and asthma. (Tr. at 10, 28-32). The Social Security Administration (hereinafter "SSA") denied the claims initially and upon reconsideration. (Tr. at 10). Thereafter, Claimant requested an administrative hearing, which was conducted on February 22, 2008 by the Honorable Andrew J. Chwalibog, Administrative Law Judge (hereinafter "ALJ").  (Tr. at 21-43). By decision dated April 29, 2008, the ALJ determined that Claimant was not disabled under the provisions of the Social Security Act. (Tr. at 10-20).  The ALJ's decision became the final decision of the Commissioner on March 26, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).  Claimant filed the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g).  (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 12, 13, 15 and 16). Therefore, the matter is ripe for resolution.

## II.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is

currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). That section provides as follows:

c) *Rating the degree of functional limitation.*

(1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or

- 4 -

more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation.  A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities.  20 C.F.R. § 404.1520a(d)(1).

Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder.   20 C.F.R. § 404.1520a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. 20 C.F.R. § 404.1520a(d)(3).   The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusion based on the technique. The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).  The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(2).

In this particular case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through December 31, 2009.  (Tr. at 12, Finding No. 1).  At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since April 9, 2006, the alleged disability onset date. (Tr. at 12, Finding No. 2).  Turning to the second step of the evaluation, the ALJ determined that Claimant had severe impairments of chronic back pain syndrome, asthma, and bipolar disorder. (Tr. at 12-13, Finding No. 3). Nevertheless, under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 13-15, Finding No. 4). The ALJ assessed Claimant's residual functional capacity (hereinafter "RFC") as the following:

> medium exertional lifting/carrying of no more than fifty pounds maximum occasionally and twenty-five pounds maximum frequently; stand/walk six hours out of an eight-hour day; sit six hours out of an eight-hour day; no more than occasional climbing of ladders, ropes, or scaffolds or crawling; avoid concentrated exposure to temperature extremes and hazards such as machinery and heights; and avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc.; "moderately" limited in the ability to: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers and peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting; but otherwise retains the basic mental capacity to carry out at least 1-3 step routine instructions within a low social interaction demand setting.

(Tr. at 15-18, Finding No. 5).

As a result, the ALJ found that Claimant could not return to her past relevant

employment as a waitress, classified as light, semi-skilled work activity. (Tr. at 18, Finding No. 5). The ALJ considered that Claimant (1) was 33 years old on the established disability onset date, defined as a younger individual aged 18-49 years old; and (2) had a limited education, but could communicate in English. (Tr. at 19, Finding Nos. 6 and 7).  Transferability of job skills was immaterial, because the Medical-Vocational Rules, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"), supported a finding of "not disabled," regardless of whether or not Claimant had transferable job skills.  (Tr. at 19, Finding No. 8). Using the grids as a framework, considering Claimant's additional limitations, and relying upon the testimony of a vocational expert, the ALJ concluded that jobs existed in significant numbers in the national and regional economy that Claimant could perform; therefore, Claimant was not under a disability as defined in the Social Security Act.  (Tr. at 19-20, Finding Nos. 9 and 20).

## III.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence.   In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court is not charged with conducting a *de novo* review of the evidence.  Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of

the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001).  If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision."    *Blalock v. Richardson, supra* at 775*.*

A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

## IV.    Claimant's Background

Claimant was thirty-five years old at the time of her administrative hearing. (Tr. at 25). She completed the eleventh grade in school, but was diagnosed with a learning disability and placed in special education courses.  (Tr. at 26 and 32).  She never obtained a GED.  (Tr. 26).  At age 18, Claimant completed a Wechsler Adult Intelligence Scale, which reflected a verbal IQ of 83, a performance IQ of 83, and a full scale IQ of 81, placing Claimant in the low average range of intelligence.  (Tr. at 252).  Claimant's prior work experience included waitressing. (Tr. 27).  Her primary language was English, and she could read, write, and perform basic math problems with some difficulty (Tr. at 26-27).

## V.    Claimant's Challenges to the Commissioner's Decision

Claimant challenges the decision of the Commissioner on two bases.  First, she contends that the ALJ erred by not finding her impairments to be medically equivalent to the conditions outlined in the Listing.  According to Claimant, the combined effect of her exertional and non-exertional impairments "demands such a conclusion." (Pl. Br. at

5).  Second, Claimant argues that the ALJ improperly determined that she was less than credible when describing the intensity, persistence, and limiting effects of her symptoms.  (Pl. Br. at 5-7).  Claimant emphasizes that the medical records support her allegations and "[t]here is no rational reason to afford [her] testimony anything less than full credibility."  (Pl. Br. at 7).

In response, the Commissioner asserts that Claimant's impairments do not meet the criteria of any listed impairment, as is evidenced by the fact that Claimant is unable to identify a single listing to which she claims medical equivalency.  (Def. Br. at 9).  In addition, the Commissioner argues that the ALJ properly assessed Claimant's credibility using the two-step process set forth in the Social Security regulations.    The Commissioner stresses that Claimant relied upon credibility standards contained in case law that has since been superseded.

## VI.   <u>Relevant Evidence</u>

The Court has reviewed all of the evidence of record, including medical documentation.  To the extent that the evidence bears on the issues in dispute, the Court summarizes it as follows:

### A.   **Physical Impairments**

Claimant alleges two physical impairments, asthma and chronic back pain.  The first medical record in evidence pertaining to either condition is dated April 26, 2006 and was prepared by David Revell, M.D., of Valley Health Systems.  (Tr. at 224).  On this date, Claimant complained of burning pain in the lumbar area that radiated down the lateral aspect of her right leg to her mid-calf area.  According to Claimant, she first suffered from low back pain after the birth of her 13 year old son.  An MRI was performed at that time, which was negative.  Claimant reported that the pain currently

was keeping her up at night. Dr. Revell did not diagnose Claimant's condition, but did prescribe Neurontin and Celebrex. (*Id.*). At a follow-up visit on May 8, 2006, Claimant indicated that she liked the Celebrex and the Neurontin was providing slight relief, so Dr. Revell increased the dosage of Neurontin. (Tr. at 222).

Claimant called Dr. Revell's office on May 9 and May 11, 2006, complaining that the medication was preventing her from sleeping. (Tr. at 220-221). Dr. Revell added a prescription of Seroquel, a medication used to treat bipolar disorder. However, Claimant called again on May 18, 2006, reporting that the Celebrex was no longer effective, and she was in pain "pretty much all the time." (Tr. at 219).

On July 6, 2006, Claimant returned to Dr. Revell's office for evaluation. (Tr. at 217). She told Dr. Revell that she had been seeing a psychiatrist and had been given some medication changes. She also advised that she was doing "OK" with her lower back pain and was no longer taking NSAIDs for the discomfort. (*Id.*). Dr. Revell gave Claimant some samples of Naprelan, which is a prescription dose of Naprosyn used to relieve pain caused by arthritis. He also wrote Claimant a prescription for Naprosyn, in the event Naprelan proved helpful. (*Id.*). Two days later, Claimant called and complained that her back was "still killing her." She reported that she had to crawl around and requested additional medication. (Tr. at 216). Dr. Revell wrote a prescription for Lortab.

Claimant returned to Dr. Revell on September 18, 2006 for a follow-up visit. (Tr. at 214). She continued to complain of low back pain, admitting that her compliance with the Naprosyn regimen was poor. She also indicated that she wanted to quit smoking, because she felt like she was wheezing and was "hacking up stuff." Dr. Revell noted that Claimant was not her usual self and almost sounded drugged. He listened to

her lungs and noted increased bronchial breath sounds and wheezing. He started Claimant on Advair and Nicoderm. Dr. Revell documented that Claimant's back was stable. (*Id.*).

On October 12, 2006, Claimant presented to Dr. Revell's office for breathing problems. She told a nurse practitioner that she did not like the Advair and wanted an Albuterol inhaler. She reported that she had wheezing at night and admitted that she had not started the Nicoderm patches. The nurse practitioner counseled Claimant on smoking cessation and prescribed an Albuterol inhaler.

### B.    Mental Impairments

Claimant asserts two mental impairments, learning disability and bipolar disease. Assessment records relating to her alleged learning disability are limited and begin in May 1990. (Tr. at 112-114). At that time, Claimant was referred for an academic assessment by her classroom teacher, who reported that Claimant tried, but was unable to do 11th grade work. The assessment revealed that Claimant was performing below average in mathematics, reading and writing, but was in the average range for spelling. (Tr. at 114).    On October 2, 1990, Claimant's academic challenges were further evaluated by a psychologist, who administered the Wechsler Adult Intelligence Scale-Revised. (Tr. at 110-111). Claimant received a verbal scale IQ of 83, a performance scale IQ of 83 and a full scale IQ of 81. Her scaled scores fell between the fifth grade to ninth grade level, with a strength demonstrated in verbal comprehension and a weakness identified in numerical reasoning. As a result of this testing, Claimant qualified for the learning disability program, which provided an individualized education program and heightened monitoring in her classes. (Tr. at 103-108). Unfortunately, Claimant did not complete sufficient hours to qualify for graduation from high school. (Tr. at 102).

The first mention in the evidence of Claimant's psychiatric disorder was made on November 16, 2004 a month after the delivery of her third child.   (Tr. at 231-233). Claimant complained of depression and was given a prescription for Zoloft.  (Tr. at 231). On June 21, 2005, Dr. Revell refilled the prescription, noting that Claimant was doing well, but had "a lot of child care responsibilities."  (Tr. at 229).

On November 14, 2005, Claimant complained to Dr. Revell of increased stress and depression.  (Tr. at 226).  She indicated that she had stopped Zoloft due to its side effects and was experiencing irritability and insomnia.  She described having crying spells and suicidal ideations, but had not developed a plan.  She stated that she loved her children and would not hurt herself.  She also advised Dr. Revell that her father had significant mental illness.  (*Id.*).  Dr. Revell documented that Claimant related well with good eye contact and seemed to have insight and judgment.  He felt that she had anxiety and depression, but did not feel she was suicidal or psychotic.  He prescribed Seroquel and scheduled a follow-up visit in two weeks.  (*Id.*).   Claimant followed-up as directed and advised Dr. Revell that the Seroquel was helping with the insomnia, but she still needed medication to help her "mood" during the day.  (Tr. at 225).  Claimant continued to have psychiatric symptoms, ultimately advising Dr. Revell on April 26, 2006 that she believed she was bipolar.  (Tr. at 224).

On May 30, 2006, Claimant presented to the office of Mahija Kottapalli, M.D., a psychiatrist practicing in Teays Valley. (Tr. at 269).  Claimant apparently had a pre-existing treatment relationship with Dr. Kottapalli; although, prior records were not offered into evidence.  Claimant told Dr. Kottapalli that her appetite had decreased; she was more short-tempered and unbearable; and her insomnia persisted.  Dr. Kottapalli increased Claimant's dosage of Topamax.  (*Id.*).  However, within a week, Claimant

stopped taking the Topamax, because she felt the medication was causing her to have chest pain and numb feet. (*Id.*). She asked Dr. Kottapalli to write her a prescription for Trileptal, a medication that seemed to work well for her sister. (*Id.*). Dr. Kottapalli called in a prescription for her.

Claimant returned to Dr. Kottapalli's office on June 29, 2006. (*Id.*). Claimant reported that she was having yelling attacks, exploding over small things and making her want to "wring somebody's neck." She indicated that she liked the Trileptal and had increased the dosage herself. She requested something to help calm her, so that her family would not feel that she was so grouchy. (*Id.*). Dr. Kottapalli started Claimant on an antipsychotic medication and decreased her dose of Trileptal.

On July 31, 2006, Claimant arrived at Dr. Kottapalli's office with her sister, son and daughter. (Tr. at 270). She complained that her son was annoying and that she was always screaming and arguing with him. She found herself crying all the time and felt like going down the road and never returning. After some counseling, Dr. Kottapalli increased Claimant's does of Klonopin. (*Id.*).

On a follow-up appointment on August 31, 2006, Claimant expressed concern over her son's behavior. She indicated that he had been aggressive with his older sister. (*Id.*). Claimant complained that she was under increased stress and had been crying for two days. She reported that she lived close to her sister and with her father, who both had mental health problems. Dr. Kottapalli described Claimant as tearful and dysphoric. She increased Claimant's Lexapro. (*Id.*). However, when Claimant returned one month later for her regular appointment, her condition had not changed. (*Id.*). On this visit, she expressed worry over her daughter. She also confessed that she did not believe she would get better no matter what she tried. Nonetheless, she refused to see a therapist or

take her children to therapy, claiming a lack of transportation.  She also indicated that she was unable to take her medications during the day, because she needed to care for her daughter.  (*Id.*).

Claimant again presented to Dr. Kottapalli's office on February 20, 2007.  (Tr. at 268).  On this visit, she complained about her sister's family and their "drama."  She also stated that her daughter had many problems.  Claimant told Dr. Kottapalli that she was under increased stress and was losing her hair.  She requested medication to decrease her appetite.  (*Id.*). Dr. Kottapalli increased Claimant's psychiatric medication.

When she returned to Dr. Kottapalli's office on May 17, 2007, Claimant primarily complained about her son's behavior and his anger.  (*Id.*).  She reported that she continued to be under stress, but her mood was stable.   Dr. Kottapalli counseled Claimant on her medication usage and recommended a return visit in three months. (*Id.*).   Claimant returned in August as instructed and continued to complain about her son's behavior.  This discussion carried over to her next visit in November, where Dr. Kottapalli noted that Claimant was tired and withdrawn and expressing stress over her son's bad behavior.  (*Id.*).

### C.    Agency Evaluations

On August 7, 2006, Claimant was evaluated by Elizabeth Durham, a Masters level psychologist, at the request of Disability Determination Services ("DDS").  (Tr. at 187-191).   Ms. Durham conducted a mental status evaluation and clinical interview of Claimant.  Ms. Durham noted that Claimant had a good attitude and was cooperative. She walked with a normal, steady gait and did not use any assistive devices for ambulation.  Claimant stated that she lived with her father, two daughters, and teenage son.  Her father received Social Security benefits; her son received SSI, and she received

food stamps.  She reported that she was applying for disability benefits, because she was bipolar, learning disabled, and had back and sleep problems.  (*Id.*).   Claimant told Ms. Durham that she treated with Dr. Kottapalli once each month for dysphoric mood and crying spells.  When questioned about her work history, Claimant stated that she had worked as a waitress for six years and quit when she became pregnant with her daughter.  She confirmed that she had never been fired or disciplined on any job.

Ms. Durham observed that Claimant was dressed appropriately; had normal eye contact; was fully oriented and spoke with normal tone and pace.  Claimant appeared dysphoric, but her speech content was normal, her concentration was normal and her judgment was also within normal limits.  (*Id.*).   Mr. Durham reviewed Claimant's IQ test from 1990 and learned from Claimant that she had been in special education classes, but had not finished high school.  Ms. Durham assessed Claimant with Bipolar Disorder Not Otherwise Specified, based upon Claimant's descriptions of major depressive disorders and hypomanic phases.  Ms. Durham found Claimant to display normal social functioning, persistence and pace.  (*Id.*).

On August 28, 2006, Joseph Kuzniar, Ed.D., completed a Mental Functional Capacity Assessment and Psychiatric Review Technique.  (Tr. at 193-210).  Dr. Kuzniar found evidence of an affective disorder; specifically, a bipolar syndrome.  (Tr. at 200). Upon evaluating the "B" criteria, he determined that Claimant had mild limitations in activities of daily living and in maintaining concentration, persistence or pace and had moderate limitations in maintaining social functioning.  (Tr. at 207).  Dr. Kuzniar saw no evidence of "C" criteria. He added that Claimant's credibility was partial, because of inconsistencies between the results of Ms. Durham's examination, the IQ test, and the difficulties voiced by Claimant.  (Tr. at 209).  In assessing Claimant's mental residual

functioning, Dr. Kuzniar found mild limitations in Claimant's understanding and memory; mild limitations in sustained concentration and persistence with moderate limitations in her ability to perform activities within a schedule and complete a normal workday or workweek; mild limitations in social interaction with moderate limitations in accepting instructions and getting along with coworkers without being distracted; and mild limitations in adaptation with moderate limitations in responding appropriately to changes in the work setting. (Tr. at 193-194). Dr. Kuzniar opined that Claimant had "the capacity to carry out at least 1-3 step routine instructions within a low social interaction demand." (Tr. at 195).

On December 13, 2006, these evaluations were updated by Dr. Holly Hoback Clark, a local psychiatrist. (Tr. at 236-253). Dr. Clark also found evidence that Claimant suffered from an affective disorder, namely, bipolar syndrome. Her evaluation of the "B" and "C" criteria mirrored the opinions set forth by Dr. Kuzniar. (Tr. at 250-251). Dr. Clark likewise concluded that Claimant was not entirely credible, stating:

> She alleges problem with memory, completing tasks, concentration, understanding, following instruction, and getting along with others. She did have some difficulty remembering: however, she understood and answered politely while presenting information to DO. Testing showed an IQ in the 80s. At CE her memory, c/p/p, and social interaction were wnl. She is able to shop and pay bills. She does not meet or equal listing.

Dr. Clark's Mental Residual Functional Capacity Evaluation differed slightly from the evaluation of Dr. Kuzniar. (Tr. at 236-239). Dr. Clark found no significant limitations in Claimant's understanding, memory, concentration, persistence, adaption, and social interaction with the exception that Claimant was moderately limited in her ability to interact appropriately with the general public. Dr. Clark recommended that Claimant perform "work-like activities with little contact with the general public." (Tr.

at 238).

On December 15, 2006, Dr. Uma Reddy completed a Physical Residual Functional Capacity Assessment for the SSA. (Tr. at 254-261). Dr. Reddy determined that Claimant could lift 50 pounds occasionally and 25 pounds frequently; could sit, stand or walk 6 hours each out of an 8-hour workday; and had unlimited ability to push or pull. In addition, Dr. Reddy opined that Claimant's only postural limitations involved balancing and crawling, which she could do occasionally. According to Dr. Reddy, Claimant had no manipulative, visual, or communicative limitations, but had some environmental limitations relating to extreme temperatures, hazards, and fumes, odors, dusts, gases and poor ventilation. (*Id.*). Dr. Reddy emphasized that Claimant had no medical evidence to support her claim of severe back pain and saw no "significant limitations" related to her asthma.

## VII. <u>Analysis</u>

### A. **Medical Equivalency to a Listed Impairment**

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. Inasmuch as the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990). Similarly, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings

equal in severity to *all* the criteria for the one most similar listed impairment. . . .A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Id.* at 531.[1]

Claimant makes the conclusory statement that her physical and mental impairments in combination "obviously" equal a listed impairment. However, Claimant fails to identify which listed impairment applies to her constellation of ailments. By contrast, the ALJ identified all of the body systems contained in the Listing with potentially applicable conditions, thoroughly examined the most similar listings under each section, and explained why Claimant did not meet or medically equal the criteria set forth in each.[2]   The ALJ indicated that Claimant could not meet the criteria contained in Section 1.00 dealing with the musculoskeletal system, because she had no documented evidence of nerve root compression, spinal arachnoidistis or lumbar stenosis. (Tr. at 13). Similarly, Claimant's breathing impairment did not present with sufficient severity to satisfy any of the respiratory ailments outlined in Section 3.00 of the Listing. The ALJ examined the functional restrictions associated with Claimant's mental impairments, using the special technique, and concluded that Claimant did not demonstrate marked difficulties in at least two of the paragraph B criteria, which are findings necessary to meeting the applicable disorders contained in Section 12.00 of the

---

[1] The Supreme Court explained the equivalency concept by using Down's syndrome as an example. Down's syndrome is "a congenital disorder usually manifested by mental retardation, skeletal deformity, and cardiovascular and digestive problems. *Id.* At that time, Down's syndrome was not an impairment included in the Listing. Accordingly, in order to prove medical equivalency to a listed impairment, a claimant with Down's syndrome had to select the single listing that most resembled his condition and then demonstrate fulfillment of the criteria associated with that listing.

[2] The ALJ examined Section 1.00, Musculoskeletal System; Section 3.00, Respiratory System; and Section 12.00, Mental Disorders.

Listing. Finally, the ALJ examined Claimant's medically determinable impairments, both severe and non-severe, considering their cumulative and synergistic effects and found no evidence of medical equivalency.  (Tr. at 15).

Accordingly, the Court finds that the ALJ fully considered the issue of the medical equivalency of Claimant's combined impairments to the criteria set forth in the most applicable listed impairments and correctly eliminated each one.  As such, the ALJ's ultimate conclusion that Claimant's impairments did not rise to the severity level of any condition outlined in the Listing was supported by substantial evidence.

### B.      Claimant's Credibility

Claimant argues that the ALJ erred in finding Claimant less than credible when describing the persistence, intensity, and limitations associated with her symptoms.  She asserts that her medical evidence and testimony were "mutually supportive;" therefore, she should be afforded full credibility.  To the contrary, the Commissioner contends that Claimant has relied upon an outdated standard for judging credibility.  According to the Commissioner, the ALJ was required to apply the two-step process outlined in 20 C.F.R. §§ 404.1529 and 416.929 to evaluate Claimant's subjective complaints of pain and psychological distress.  The Commissioner stresses that the ALJ fully complied with this mandate and reached a logical and substantiated determination.  Having reviewed the evidence, the Court agrees with the Commissioner.

Social Security Ruling 96-7p clarifies the two-step process by which the ALJ must evaluate symptoms, including pain, to determine their limiting effects on a claimant. *See, also* 20 C.F.R. §§ 404.1529 and 416.929.  First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms.  SSR 96-7P.  Once the ALJ

finds that the conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. The Ruling sets forth the factors that the ALJ must consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. The Ruling further directs that the credibility determination must be based on a consideration of all of the evidence in the case record. *Id.*

When evaluating whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not simply replace its own *de novo* credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence . . . or substitute its own judgment for that of the Commissioner." *See Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976).

Here, the Court finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulations, case law, and Social Security Ruling and was supported by substantial evidence. 20 C.F.R. § 404.1529; SSR 96-7p; *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). Considerable evidence existed in the record that

Claimant's complaints of pain and psychological distress did not correlate with her reported level of activity, her functional abilities, and the objective medical records.

As stated in his written decision, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but her statements concerning their intensity, persistence, and limiting effects were not credible when considering the evidence in its totality. On the issue of Claimant's learning disability, the ALJ pointed out that Claimant's intelligence testing reflected cognitive functioning in the low average range. Certainly, Claimant's IQ scores were not low enough to meet a listed impairment, and Claimant had no evidence that her alleged learning disability adversely affected her adaptive functioning. Instead, Dr. Clark noted that Claimant paid the bills, did the shopping, and cared for her children, all evidence that she was intellectually capable of managing daily tasks. Although Claimant was placed in special education classes in high school, she was able to work as a waitress for seven years, which required the ability to organize, concentrate, perform simple mathematics, and respond to customer demands. She left this position because of pregnancy, not because she was intellectually incapable of performing the job duties. (Tr. at 126). In any event, the ALJ accounted for this impairment in Claimant's RFC, by limiting her to jobs that required only 1-3 step routine instructions within a low social demand setting.

The ALJ also considered Claimant's contention that her bipolar disorder caused her to experience anger control issues, which prevented her from working. He rejected this contention, because the records lacked sufficient evidence to suggest that Claimant's bipolar syndrome was disabling. The ALJ observed that Claimant's symptoms were effectively managed with medication. She never required crisis

intervention or inpatient stabilization, and all of her mental status examinations were essentially normal.  Although Claimant tended to isolate, she maintained relationships with family members and went out in the general public to attend her daughter's soccer games, shop, and keep doctors' appointments.  (Tr. at 18).  Notably, Claimant spent a substantial amount of time at her son's school and closely interacted with school officials in an effort to improve her son's behavior. Despite this evidence to the contrary, the ALJ gave Claimant the benefit of the doubt and included specific limitations in Claimant's RFC to reflect the alleged restrictions associated with her psychological illness.  For example, the ALJ presumed that Claimant would experience moderate limitations in her ability to maintain a regular schedule, be punctual, work in coordination with others, complete a normal workday, perform at a consistent pace, accept criticism from supervisors, accept instructions, and interact appropriately with the general public.  (Tr. at 15).  The restrictions in Claimant's RFC were particularly generous when considering that the agency psychiatrist found only mild impairment in most of these functions as evidenced in Claimant's most recent mental residual functional capacity assessment.

On the issue of her complaints of pain, the ALJ relied, in part, upon the lack of medical records describing persistent and severe back pain to conclude that Claimant's statements regarding pain were not credible.  He observed that Claimant had received minimal treatment for her back.  Her MRI was normal, and she had never required aggressive treatment, pain management, assistive devices or aids, or further evaluation by a specialist.  (Tr. at 18).  Although the ALJ was prohibited from rejecting Claimant's allegations of pain *solely* on the basis that the pain was not substantiated by objective medical evidence, he properly considered the lack of objective evidence and other

corroborating evidence as factors in his decision.  *See Craig v. Chater,* 76 F.3d. 585 (4th Cir. 1996). Despite the paucity of evidence validating the existence of disabling pain, the ALJ once again accounted for Claimant's alleged physical impairments by developing a detailed and individualized RFC that limited her climbing and crawling, as well as her exposure to environmental factors that could potentially exacerbate her asthma.  (Tr. at 15).

Having scrutinized the ALJ's decision and the evidence in its totality, the Court finds that the ALJ thoroughly considered Claimant's complaints of pain and psychological distress, conducted a reasoned review of the evidence, and adequately explained the grounds underlying his credibility determination.  Consequently, the ALJ's ultimate finding regard has substantial evidentiary support.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  June 1, 2011.

Cheryl A.  Eifert
United States Magistrate Judge

- 23 -